(No. 23404.—

THE PEOPLE *ex rel.* Edward J. Barrett, Auditor of Public Accounts, *vs.* THE CAIRO-ALEXANDER COUNTY BANK.— (THE CAIRO BRIDGE COMPANY, Appellee, *vs.* WILLIAM L. O'CONNELL, Receiver, Appellant.)

*Opinion filed June 10, 1936.*

WILSON, J., dissenting.

M. J. O'Shea, Alexander Wilson, and Joe Crain, for appellant.

William S. Dewey, and Winston, Strawn & Shaw, for appellee.

Mr. Justice Shaw delivered the opinion of the court:

The Cairo-Alexander County Bank was organized under the State law with general banking powers and in addition thereto had qualified to do a trust business. It went into liquidation August 2, 1933, and appellant was appointed receiver August 15, 1933. The Cairo Bridge and Terminal Company was a Delaware corporation whose properties were located in Illinois, and receivers were appointed for it April 6, 1932. These appointments were in the Federal court, and the receivers operated the property until July 6, 1933, at which time the appellee, the Cairo Bridge Company, was formed and took over all of its assets. The receivers executed an assignment to the new company covering all of their claims against the bank.

The appellee bridge company filed two claims in connection with the receivership of the aforesaid bank, one for $33,083.13, as to which it claimed a preference, and another for $5354.76, as to which no priority was urged. The claim of preference as to the larger item was based upon certain book-keeping transactions and certain agreements between the receivers for the bridge company and the officers of the bank, prior to its closing, which will be hereinafter noticed. The trial judge in the circuit court denied any preference, and an appeal was taken from his order to the Appellate Court for the Fourth District, where that judgment was reversed. (282 Ill. App. 343.) The cause comes here on further appeal upon leave granted.

The record shows that in the late fall of 1932, Wesley E. Cummins, one of the receivers appointed by the Federal court, opened negotiations with David S. Lansden,

then president of the bank, seeking security for the funds of the receivers then on deposit. It was determined that the bank could not give a depositary bond, and it was then suggested that the account be transferred to the trust department of the bank, which was afterward done. On January 14, 1933, Lansden, as president of the bank, wrote a letter addressed to the bank ordering and directing that the funds of the receivers for the bridge company be placed in a trust department account. There was no actual transfer of cash at any time, but there was a book entry on January 31, 1933, transferring the sum first above mentioned to a "trust account," and it was so carried until March 3, of that year, when the bank closed under the general moratorium of that date. The bank never re-opened and was eventually put in liquidation, as hereinabove stated. The capital stock of the bank was $250,000 and at the date of its closing it had total liabilities of $1,738,165.74, most of which, or more than one and one-half million dollars, was deposit liability. The cash on hand at the date of closing was $15,577.92, and there was due it from other banks $4608.40. On the date of the president's letter above mentioned the cash on hand amounted to $34,930.85, and on the date of the book-keeping entry by which the trust account was attempted to be set up the cash amounted to $38,116.53. The bank at that time was operating upon a system of restricted withdrawals, such as was then customary, by which depositors were limited in their withdrawals to five per cent of the deposit, and although this was admittedly an unenforcible arrangement, the president testified that the bank attempted to enforce it. In his testimony he does not recall that any such attempt was made in connection with the bridge receivers' account. The transfer itself consisted merely in making out a debit slip for the commercial account with a corresponding credit slip for the trust account, together with the necessary book entries. No check was drawn or cashed, no new money was

brought into the bank and no trust agreement was executed. By this means it was intended that this particular account should be secured by those securities deposited with the Auditor of Public Accounts for the purpose of authorizing the bank to act as a trustee.

It is claimed that the bank in question had made a deposit with the State Auditor under the provisions of the Trust Companies act (Ill. State Bar Stat. 1935, chap. 32, p. 928; Smith's Stat. 1935, p. 878;) and that the funds in question are secured by that deposit. It is unnecessary to pursue this line of argument as the act in question is not applicable. That act can be construed only to permit corporations who have qualified under it, to accept or execute trusts, be appointed assignees or trustees by deed, executors or guardians by will, or receivers, assignees, guardians, conservators, executors, administrators or trustees under order of court. No such case is before us. No trust was created for any purpose, nor was there any trust *res* segregated or set aside, the record showing all funds at the bank were at all times mingled in a common till. The most that can be said of the situation disclosed by the facts before us is, that there has been an ineffectual effort to pledge assets of the bank to secure and give priority to one depositor over another and *People* v. *Wiersema State Bank,* 361 Ill. 75, controls our decision. In that case we held that neither the general Banking act nor any subsequent legislation shows any intention to confer power on banks generally to pledge assets to secure deposits; that banks have only such powers as are expressly granted and necessarily implied from specific grants, and that every power not clearly granted must be regarded as withheld and prohibited. In that case we held the contract of pledge to be *ultra vires,* entirely contrary to the public policy of our State as embodied in its constitution and statutes and totally unenforcible. In the course of the opinion we said: "To permit such pledges would be inconsistent with many provisions of the Bank-

ing act which are designed to insure, in case of disaster, uniformity in the treatment of depositors and a ratable distribution of the assets. In consonance with the holdings of a majority of the courts of last resort in this country, we are of the opinion that the general practice of pledging assets by banks to secure deposits is not only unnecessary, but is dangerous to the general welfare and is against public policy." The fact that the pledge of assets in this case followed an indirect route through the Auditor of Public Accounts makes no difference in principle, as the transaction in question amounted to nothing more than an effort to have those assets stand as a pledge for the security of this particular depositor and to prefer this depositor over others.

The trial court arrived at the proper conclusion, and the Appellate Court erred in reversing that judgment.

The judgment of the Appellate Court will therefore be reversed and the judgment of the circuit court of Alexander county affirmed.

*Judgment of the Appellate Court reversed.*
*Judgment of the circuit court affirmed.*

Mr. JUSTICE WILSON, dissenting:

I am unable to concur in the majority opinion. The receivers of the Cairo Bridge and Terminal Company were under an obligation to the creditors of that company to secure its assets in so far as it was possible and for that purpose undertook to have certain funds on deposit with the Cairo-Alexander County Bank transferred to the trust department of that institution. This transfer was made more than a month before the bank closed its doors. It is true the money was not drawn out of one window and redeposited in another, but such is not the way of doing business in banking institutions. The legal effect of the transfer on the books of the bank was the same, however, as if the receivers of the bridge company had withdrawn this

fund and re-deposited it with the trust department. *American Exchange Nat. Bank* v. *Gregg,* 138 Ill. 596.

The trust department of the bank was inaugurated in accordance with the legislative enactment, (Ill. State Bar Stat. 1935, chap. 32, p. 928; Smith's Stat. 1935, p. 878;) which provided that certain securities should be deposited with the Auditor of the State as collateral for trust funds in the hands of the bank. We are not concerned with the validity of the provisions of the Trust Companies act giving the bank the right to create such a trust department, inasmuch as the constitutional question has not been raised. A trust department was in existence, however, as part of the Cairo-Alexander County Bank, and was, in fact, the trust department of that institution. There was money in the bank sufficient to pay the claim of the receivers at the time the transfer was made. It was the evident purpose to create a trust, and in my opinion such a trust was created by the action of the parties.

The case of *People* v. *Wiersema State Bank,* 361 Ill. 75, is not in point. The fund created in that case was not a trust fund but an illegal preference. It arose out of a contractual agreement between the depositor and the bank, under which the bank placed certain securities in escrow in order to secure a deposit. This agreement provided that in the event the bank failed or did not pay the deposit when demanded, the depositor, the Fernwood Park District, could subject the collateral so deposited in escrow to the satisfaction of its claim. This was an attempt to place the deposit of the park district on an entirely different footing from all other deposits in the bank, and this, it was held, was beyond the power of the bank to do. In the case at bar the receivers of the Cairo Bridge and Terminal Company could only share *pro rata* with the other creditors of the bank out of the funds deposited as security with the State Auditor and with such *cestuis que trust* as were similarly situated. In the case of *People* v. *Wiersema State*

*Bank* the depositor pro-rated with nobody but looked to the security placed in escrow to secure his claim. So far as I am able to see, there is no legal similarity.

For the reasons stated I am compelled to dissent from the majority opinion.